UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-CR-36 (JRT/JFD)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | **GOVERNMENT'S SENTENCING POSITION** |
| KASSIUS ORLANDO BENSON, | |
| Defendant. | |

The United States of America, by and through its undersigned attorneys, submits this memorandum stating its sentencing position. On December 4, 2023, Kassius Orlando Benson ("Benson") pleaded guilty to one count of Failing to Account for and Pay Over Employment Taxes, in violation of 26 U.S.C. § 7202. For more than half a decade, Benson, a lawyer who practiced criminal law in Minnesota and who even represented at least one client indicted for federal employment tax violations, withheld taxes from the wages of his law practice's employees but never filed employment tax returns reporting those withholdings and never paid over those taxes he held in trust to the Internal Revenue Service ("IRS"). The government submits that the appropriate sentence for Benson's criminal conduct is 8 months' imprisonment, followed by three years of supervised release, restitution in the amount of $213,591.81, and a mandatory special assessment of $100.

A.  **The Presentence Investigation Report**

The government has no objections to the final presentence investigation report ("PSR") dated February 28, 2024. The government agrees with the PSR's Guidelines calculation that the applicable Guidelines range is 8 to 14 months.

**B.      Background**

Not once from 2013, when Benson hired his first employee for Kassius Benson Law, P.A. ("KBL"), through 2019, has Benson paid over a single cent of the employment taxes he withheld from his employees' paychecks.[1]

The IRS caught onto Benson's failure to pay over employment taxes in July 2020. A civil audit ensued. As part of that audit, the IRS contacted Benson on July 29, 2020, alerting him to the fact that the IRS was looking into his non-payment of employment taxes. Between August 2020 and February 2021, when the case was referred to IRS's criminal investigations, Benson had multiple communications back and forth regarding his repeated failures to pay over employment taxes due from his law practice.

In October 2020, months after being contacted by the IRS, Benson filed a joint 2019 U.S. Individual Income Tax Return (Form 1040) that falsely claimed a credit for withholdings from his own wages when he knew full well that those withholdings had not been paid over to the IRS.

In total, in 2013 and from 2015 to 2019, Benson kept for his own use $213,591.81 that should have been paid over to the United States Treasury.

      **i.      Eighth Circuit Says Tax Crimes Are Deserving of Prison**

Tax crimes are hard to detect and take substantial resources to prosecute. To eliminate the perception that it pays to commit tax crimes and to punish those who are caught, the Sentencing Guidelines for tax fraud were "intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length." U.S.S.G. § 2T1.1, Background. "Because of the

---

[1]     In 2013, KBL had one employee. In 2014 and most of 2015, KBL did not have any employees. KBL hired two attorneys in the fourth quarter of 2015. KBL had four employees in 2016 and 2017, and three employees in 2018 and 2019.

limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators." U.S.S.G. § 2T1.1, introductory cmt.

The Court of Appeals for the Eighth Circuit agrees. In *United States v. Ture*, the Eighth Circuit emphasized "the importance of a term of imprisonment to deter others from stealing from the national purse." 450 F.3d 353, 358 (8th Cir. 2006) (finding an abuse of discretion when the district court imposed a probationary sentence). Despite the fact that the defendant in *Ture* was 68 years-old and suffered from multiple serious medical issues, the Court's guidance to the district courts was clear: "willful tax evaders often go undetected such that those who are caught -- especially those who are caught evading nearly a quarter-million dollars in tax -- must be given some term of imprisonment." *Id*. at 358.[2] Similarly, the Eighth Circuit in *United States v. Carlson* reiterated *Ture's* reasoning stating that "'the district court failed to adequately consider the seriousness of [a tax criminal's] offense, the goal of promoting respect for our federal tax laws, and the need for a just sentence when formulating [the criminal's] sentence,'" when it vacated the district court's no jail sentence and remanded for resentencing. 498 F.3d 761, 764-67 (8th Cir. 2007) (quoting *Ture*, 450 F.3d at 358).[3]

"Extraordinary justification" is needed when "a variance to zero prison time where the Sentencing Commission has found that substantial prison time is indicated." *United States v.*

---

[2] The *Ture* Court considered the near four-year duration of the defendant's criminal conduct, the $240,252 of tax that was evaded, and the defendant's use of an employee to help him with the crime as serious criminal conduct warranting prison. *See generally*, 450 F.3d 353.

[3] The *Carlson* Court also held that the "district court failed to adequately consider the need to avoid unwarranted sentencing disparities among similar defendants." *Carlson*, 498 F.3d at 765.

*Soperla*, No. 06-3316, 494 F.3d 752 (8th Cir. July 27, 2007) (quoting *United States v. McDonald*, 461 F.3d 948, 957 n.7 (8th Cir. 2006).

### ii. Benson's Professional Ethical Duties Exceed an Ordinary Employer's

As an attorney, Benson swore an oath to be able to practice law in Minnesota. That oath mandated Benson conduct himself "in an upright and courteous manner . . . and that [he] will use no falsehood or deceit." Minn. Stat. Ann. § 358.07(9). Minnesota Professional Rule 8.4(b) prohibits an attorney from commit[ting] a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects," and Rule 8.4(c) prohibits an attorney from "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentations." Minnesota Court Rules, Professional Rules, https://www.revisor.mn.gov/court_rules/pr/subtype/cond/id/8.4/ (last visited March 5, 2024).

### iii. Tax Crime Sentencing Statistics

In 2022, approximately 59.3 percent of tax fraud criminals were sentenced to prison. Exhibit A (U.S.S.G. Quick Facts, Tax Fraud Offenses). The average sentence for these individuals was 13 months.

Attached to this memorandum as Exhibit B is a table detailing 23 cases in the District of Minnesota involving violations of Section 7202.[4] In 16 of these 23 cases (or 69%), defendants received prison sentences ranging from time-served to 60 months.

## C. Eight Months in Prison Is Appropriate

A prison sentence is appropriate after weighing the sentencing factors under 18 U.S.C. § 3553(a). Benson's criminal conduct was serious and netted him approximately $213,000

---

[4] The undersigned ran a search in Lexis CourtLink to find these results. This is a complete list of the items returned when searching dockets in the District of Minnesota that included keywords "7202" and "sentenced."

(18 U.S.C. § 3553(a)(2)(A)); his crime was not a single act or a crime of opportunity, but instead was conducted over many years and involved repeated decisions by Benson to lie and produce false documents (18 U.S.C. § 3553(a)(1)); his status as a well-known attorney and leader in the community calls out for serious consequences to deter others from committing the same hard to detect crime (18 U.S.C. § 3553(a)(2)(B)); and a prison sentence under these factual circumstances avoids unwarranted disparities (18 U.S.C. § 3553(a)(6)).

  i. **Tax Crimes Are Serious**

One cannot minimize the importance of the programs, utilities, and services the United States funds through tax collection. The system relies on the voluntary and honest reporting of one's income and tax liabilities. On an individual level, an employer's failure to timely pay over correct withholdings can hinder employees' ability to obtain Medicare and Social Security benefits to which they are entitled. On an industry level, nonpayment undermines competition and gives unscrupulous employers an advantage over their law-abiding competitors. On a national level, it directly contributes to the United States' $496 billion tax gap[5] and the predicted insolvency of programs, such as Social Security's Old-Age and Survivors Insurance Trust Fund and Medicare Part A.[6] Both programs, which are expected to run out of funds, rely on employment taxes to pay

---

[5] The "tax gap" represents the estimated difference between taxes owed and taxes voluntarily paid. IRS Publication 1415, *Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2014-2016* 8 (Rev. 10-2022). Unpaid employment taxes are the second-largest contributor to the tax gap, with $93 billion not voluntarily paid each year. *Id*.

[6] The Social Security Old-Age and Survivors Insurance trust fund, which is used to pay retirees, dependents of retirees, and their survivors, is expected to run out of funds in 2033. *The 2023 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds* 3 (2023), available at https://www.ssa.gov/oact/TR/2023/ (last visited March 13, 2024). The Medicare Hospital Insurance trust fund (Medicare Part A), which pays for hospital services, hospice care, and post-hospitalization nursing and home health services, is expected to run out of funds in 2031. *2023 Annual Report of The Boards of Trustees of The Federal Hospital Insurance and Federal Supplementary Medical Insurance*

current beneficiaries and to fund the trusts used to pay future beneficiaries. Benson, and people like him, are the reason for the enormous $93 billion tax-gap related to employment taxes.

Moreover, Benson's conduct netted him approximately $213,000. Approximately $193,317 was stolen in the four years from 2016-2019. That is approximately $50,000 in untaxed income per year for four years that Benson engaged in his scheme. For context, the median household income in Minnesota from 2018 to 2022 was $84,313.[7] *See* United States Census, QuickFacts, Minnesota, available at https://www.census.gov/quickfacts/fact/table/MN/INC110222 (last visited March 11, 2024). Assuming a total percentage of FICA, federal tax, and state tax rate of 31.97% (described below in Section D.ii), the median net household income in Minnesota was approximately $57,358.13. In other words, Benson stole an amount of funds that would feed, house, and clothe an average Minnesotan household for four years.

Unfortunately, the participants in this case may be regularly exposed to the most unscrupulous fraudsters in the United States. Because of this exposure, we may have normalized fraud and tax losses that are much larger. We should not, however, view the relative seriousness of this case from our subjective perspectives. Instead, we should ask what a reasonable, average Minnesotan household receiving about $57,000 in net income per year thinks: how serious would it be if someone stole your entire years' worth of income every year for four years?

    ii.    **Benson Did Not Stop Lying Until He Signed a Plea Agreement**

Benson's conduct demonstrates he is not the honorable and integrous person he presents himself to be. The crimes Benson committed required him to lie to his employees as a matter of routine and produce false paperwork on a regular basis. Benson, through KBL, paid his employees

---

*Trust Funds* 1, 9 (2023), available at https://www.cms.gov/oact/tr/2023 (last visited March 13, 2024).

[7] This amount is believed to be gross and untaxed.

6

bi-monthly. Often times, these paychecks were accompanied by paystubs that stated the amounts KBL withheld in trust for the employees. After the end of the year, Benson would also issue Forms W-2 to its employees. These Forms W-2 informed the employees of the amounts KBL withheld and supposedly paid over to the IRS on the employees' behalf. Every time that Benson computed the net amount for an employee's paycheck and produced a paystub, he was producing false documents. He sat at a computer every pay period and produce paperwork that he knew was false. Every time he wrote out a check to pay his employees, he knew he was committing a crime. Every time he handed his employee a paycheck and a paystub, he was lying to them. In aggregate, calculating it on a bi-monthly basis, with multiple employees, and spanning over five years, Benson produced hundreds of false documents and told hundreds of lies.

His lies were not innocuous. By not paying into social security the money Benson held in trust for his employees, the employees were not being credited by the Social Security Administration. While fixable, Benson's conduct will contribute to these employees' headaches of making sure they receive what is rightfully theirs. If the government had not caught Benson, they may have never found out, resulting in a Social Security payments that were less than what they expected and were entitled to receive.

Benson chose to lie even though he knew he could be prosecuted for the crimes he was committing. In 2015, he was engaged to represent Kelly Louise Jaedike, a defendant who was charged under Section 7202 in this very District. *See United States v. Jaedike,* 15-cr-00248-DWF-JJK. At the same time he was defending Ms. Jaedike for not paying over employment taxes to the IRS, he was committing the same criminal conduct and was keeping his own employees'

withholdings for himself.[8] By committing these crimes during and after this representation, Benson is essentially telling this Court that he determined committing this crime had worthwhile odds.

Even after he was caught, Benson continued his lies. On his 2019 U.S. Individual Income Tax Return (Form 1040), filed *after* the IRS audit began, he claimed payments to the IRS based on "withholdings" from his wages from KBL, even though he knew KBL had not paid them over to the IRS. In that moment, Benson could have easily done the right thing when he sat at his computer filling out his tax return. It would have been simple to not lie or cheat here. He did not have to click that button that asked him to swear if everything was true and accurate. But, as a demonstration of Benson's character, he decided that what was best for him was to perjure himself.

In considering Benson's character when sentencing him, the Court should consider this fact: after years of pervasive lies, Benson showed no signs of being honest or doing the right thing until he signed the plea agreement in this case on October 9, 2023.

    **iii.**    **A Sentence of Imprisonment Will Deter Others**

Benson is not like other business owners who commit crimes. Benson should be held to a higher standard because the professional ethical obligations as an attorney mandate he conduct himself honorably. Other non-attorney business owners have no such obligation. Further, Benson voluntarily held himself out as a pillar of the legal community who was suitable to lead an entire public legal organization. In doing so, he told the legal community and the community at large: I am fit to be an example for you to follow.

---

[8]    Ms. Jaedike's sentence of 24 months' imprisonment did not even deter Benson from committing his crimes.

Other business owners may not be legally sophisticated. They may even have started their businesses without graduating high school or knowing how to keep books and records. Even so, the vast majority of these business owners learn what their legal obligations are and follow them. But not Benson. Benson knew what his legal obligations were from the beginning. He was an attorney sworn to conduct himself in a manner that would reflect positively on the courts. If Benson is not held to account, would it be unreasonable for an ordinary business owner who is not an attorney, nor sophisticated, nor a leader in their community, to think "if that guy did not get any serious consequences, I guess I have nothing to fear except some attorney fees"?

Moreover, this is a unique case where the defendant's own conduct tells this Court that a sentence of 24 months' imprisonment was not enough to deter him from committing his crime.[9] *See Jaedike,* 15-cr-00248, Dkt. No. 85. Benson continued his criminal conduct even after his representation of Ms. Jaedike. While we do not know what sentence would have deterred Benson, the Court can be certain that Ms. Jaedike's sentence, which the Court varied downward to achieve, did not.

    iv.    **A Prison Sentence Avoids Unwarranted Disparities**

The Sentencing Guidelines reflect the consensus that those convicted of economic crimes should not be able to avoid incarceration, even where such crimes constitute a defendant's first offense. The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify a serious problem in the criminal justice system: "white-collar offenders . . . frequently do not receive

---

[9] Although Jaedike did not ultimately plea to a Section 7202 charge, the plea agreement's factual basis included Jaedike's Section 7202 conduct. *Jaedike,* 15-cr-00248, Dkt. No. 59.

9

sentences that reflect the seriousness of their offenses." *See* U.S.C.C.A.N., 98th Cong., 2nd Sess. (1984) at 3260.

Moreover, considering the tax loss and Benson's unique position as an attorney and leader in the legal community, a prison sentence would be consistent with other sentences handed down in this District. *See* Exbibit B.

**D.     Benson's Arguments for Mitigation Are Self-Serving and Ring Hollow**

   **i. The Money Benson Stole Was Not Used to Keep KBL "Afloat"[10]**

Benson tells this Court the singular reason he committed the crime was to do right by his employees and his business: "[a]though my wrongful decisions were *the* result[11] of my efforts to keep the firm afloat to protect not only myself but my employees to whom I felt an obligation." PSR p. 8 (emphasis added). This is an unconvincing attempt to minimize his moral and ethical culpability by covering himself with a cloak of righteousness; asking this Court to agree that he stole for a just reason.

Benson's statement is not supported by the facts.

When Benson hired his first employee in 2013, did he attempt to pay employment taxes? No. Did he attempt to file the correct Forms 941? No. For his above claim to be true, from the instant Benson hired his first employee, he was so underwater that if he had paid a single cent of

---

10     The spreadsheets used to calculate the numbers in this section were disclosed to Benson in discovery under Bates USA-0013294 to 13553 and USA-00027498 to 27499.
11     The online Merriam-Webster's dictionary defines "result" as: "to proceed or arise as a consequence, effect, or conclusion." *See* https://www.merriam-webster.com. In Benson's usage, "result" seems to imply some sort of inevitability as if "the result," i.e., the only option, to keep a business afloat was to commit tax fraud. By framing it this way Benson is also saying that asking for investment from family or friends could not be the result of trying to save your business, nor could taking out loans, nor could getting your own personal expenditures under control so you could pay your taxes. There is only one result in this case, and that is: Benson's own decisions and choices resulted in the theft from the United States.

the $13,758.38 he owed for 2013 his business would have toppled. The question then is, did Benson attempt to repay what he owed when he had the money? Well, his purchase and financing of a Harley Davidson gives us the answer. From 2017-2020, Benson spent approximately $13,000 financing a Harley Davidson motorcycle. This demonstrates two things, first he made no attempt to address the wrongs that he knew he committed, and two, he had extra-discretionary income in later years when he claims he was attempting to keep his firm afloat.

Moreover, what did Benson learn from not being able to support an employee or meet his obligations in 2013? Apparently very little. In late 2015, he began hiring again. Knowing he previously failed to keep up with his legal obligations, "protecting" his employees would have been telling them during their interviews that he might be stealing their withheld taxes, not paying those amounts over to the social security or the IRS, and instead spending it on things like a Harley Davidson.

Benson was not using the money to protect his employees or keep his business afloat. Benson's personal and business bank records also show that he had significant personal expenditures for the three months leading up to the Form 941 due date.[12]

| Form 941 Due Dates: | Personal Expenditures: | Yearly Total: |
|---|---|---|
| January 31, 2016 | $38,795.97 | |
| April 30, 2016 | $36,311.74 | |
| July 31, 2016 | $38,834.44 | |
| October, 31, 2016 | $36,474.87 | $150,417.02 |
| January 31, 2017 | $42,171.94 | |
| April 30, 2017 | $46,105.27 | |
| July 31, 2017 | $39,438.72 | |
| October 31, 2017 | $40,986.66 | $168,702.59 |
| January 31, 2018 | $42,119.84 | |

---

[12] These amounts were tabulated by reviewing Benson's bank account and credit card statements. The items such as grocery, amazon, liquor, child support, car payments, etc. were included in this calculation. Other items that were clearly business expenses were not included. This was not a specific item analysis. Benson commingled his funds and regularly used his business accounts to pay for personal expenses.

11

| | | |
|---|---|---|
| April 30, 2018 | $41,386.00 | |
| July 31, 2018 | $49,268.61 | |
| October 31, 2018 | $35,573.62 | $168,348.07 |
| January 31, 2019 | $42,080.45 | |
| April 30, 2019 | $29,312.03 | |
| July 31, 2019 | $41,816.71 | |
| October 31, 2019 | $34,421.62 | $147,630.81 |

In only one three-month period did Benson's personal expenditures dip below $10,000 per month. As described below, much of the money he spent was not on necessities, but rather goods that were/are beyond his means.

Benson also paid hundreds of thousands of dollars to credit cards instead of paying the IRS. In the three years from 2017 to 2019, Benson paid a Wells Fargo Platinum Credit Card $188,884.79. From 2016-2019, Benson paid Capital One $45,779.60. In 2017 and 2018, Benson paid $26,708.45 to American Express. In total, between 2016 and 2019, Benson paid credit card bills in the amount of at least $261,372.84. Clearly, Benson prioritized these credit card payments over the IRS.

What is more is that Benson withdrew approximately $64,773.84 in cash from 2016 to 2019. This averages out to $1,349.46 per month over the four year period. This amount is significant and these amounts are not included in the table above.

Finally, Benson lacks any real debt from his business. As described in the PSR, he has a total net worth of negative $25,010. PSR, ¶ 57. What this means is that there was no real debt taken out to finance his business and Benson spent just as much as he made. What this Court would expect from a struggling business trying to stay afloat is some type of loans or debt that he tried to use to help the business. The lack of debt here is a true reflection that KBL was not a struggling business Benson was trying to keep afloat.

> ii. **Benson Has Not "Struggled" Financially Since Indictment, Just the Opposite**

Benson attempts to elicit sympathy for having stolen money from the IRS: "I have struggled a great deal with all of this. I have been impacted personally, *financially*, and emotionally." PSR, p. 9 (emphasis added). The fact is, however, that over the last several years Benson's financial condition has greatly improved and remains so even after he was indicted.

Benson makes approximately $5,000 a month more today in net income than what he made in 2020 when his second divorce was finalized. In his financial disclosure to the probation officer, Benson reported net income of $12,000 per month or $144,000 per year. PSR, ¶ 57. In 2020, according to the stipulated findings of fact from Benson's divorce decree dated August 25, 2020, Benson had gross monthly income of approximately $10,833 (*see* Exhibit C, ¶ 14(A)), which is equivalent to approximately $7,369.69 in net wages.[13] By what definition of "struggle" is making almost $5,000 more per month or $60,000 more per year in net income a plausible use of that word?

Benson also continues to live beyond his means as demonstrated by different expenses he has incurred over the last several years. On July 11, 2022, Benson upgraded his vehicle to a 2020 Dodge Ram 1500. In financial disclosures, Benson reported that the 2020 Dodge Ram 1500 costs him $876.18 a month, approximately $100 more per month than his previous vehicle. Benson also made a down payment of $3,000 in cash for this vehicle. Spending almost $900 per month for a vehicle is absurd for a person claiming to be struggling financially. Tellingly, Benson made this

---

[13]    This number assumes 7.65% for FICA withholding, a 18.79% real federal income tax rate, and a 5.53% state tax rate, i.e. $10,833 x (100% - (7.65% + 18.79% + 5.53%)) = $7,369.69.

13

lavish purchase after he received and acknowledged receipt of a Target Letter from the government that informed him that he was being investigated for stealing money from the United States.

The Court does not have to guess at what was going through Benson's mind after he was told he was being criminally investigated for debts owed to the United States because he tells the Court what was on his mind: a good-old brand new full-sized truck he could not afford. What was not on his mind, apparently, was how he can right his wrongs.

Another example of Benson's decision to live above his means instead paying his legal obligations is that he continues to live in a $5,000 a month house he began renting in March 2020. The undersigned ran a cursory search on Zillow and found comparable three bedroom plus houses in the city where Benson lives listed for thousands of dollars less.[14] It is incomprehensible to say that Benson was just trying to keep his business afloat when he was living (and continues to live) far above his means. This lease was also only for one year, so he apparently continued to renew it for at least two additional years. If you are struggling, why would you continue to pay an exorbitant amount of rent when you owe the government hundreds of thousands of dollars?

Why is this important? Because in the moment of judgment, just like when he sat in front of his computer deciding whether to click the button to perjure himself, he submits a letter to the Court that is misleading at best.

**v.     Restitution**

Defendant has agreed to pay restitution to the IRS in the amount of $213,591.81 pursuant to 18 U.S.C. $ 3663(a)(3). Plea Agreement, ¶ 9. The Court should order that such restitution be paid.

---

[14]     The average monthly rent for a three bedroom in Minneapolis is $1,995 according to Zillow. *See* Minneapolis, MN Rental Market, available at https://www.zillow.com/rental-manager/market-trends/minneapolis-mn/?bedrooms=3, last visited March 13, 2024.

**D.    Conclusion**

For these reasons, the government recommends the Court sentence Benson to a term of 8 months of incarceration, three years of supervised release, restitution to be paid to the IRS in the amount of $213,591.81, and a $100 special assessment. Such a sentence is sufficient, but not greater than necessary, to comply with the purposes set forth 18 U.S.C. § 3553.

Dated: March 13, 2024                Respectfully submitted,

STUART M. GOLDBERG
Acting Deputy Assistant Attorney General
U.S. Department of Justice Tax Division

*s/ Matthew J. Kluge*
Matthew J. Kluge
Bar Number (PA# 204285)
Attorney for the United States
Assistant Chief, Tax Division
150 M St. NE
Washington, D.C. 20002
Telephone: 202-305-3301
Matthew.J.Kluge@usdoj.gov

*s/ Christopher Lin*
Christopher Lin
Bar Number (NY# 5028618)
Attorney for the United States
Trial Attorney, Tax Division
150 M St. NE
Washington, D.C. 20002
Telephone: 202-514-2901
Christopher.E.Lin@usdoj.gov