**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

UNITED STATES OF AMERICA          :

          v.                      :          **23-cr-36-JRT**

KASSIUS ORLANDO BENSON            :

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING**

Kassius Benson comes before this Court for sentencing following a guilty plea to one count of failure to account for and pay over payroll taxes under 26 U.S.C. § 7202. In accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines, Mr. Benson, through counsel, respectfully submits his position with respect to sentencing.

Mr. Benson is in Zone B of the sentencing table.[1] Because he received an adjustment under USSG § 4C1.1, a sentence of probation that substitutes home detention for incarceration is not only guidelines-compliant, it is presumptively "generally appropriate" absent specific reasons, which do not exist here. Thus, in this instance, the Court can and should impose a probationary sentence without need for the Court to depart or vary from the advisory guidelines.

We respectfully ask this Court to fashion such a sentence in recognition of Mr. Benson's acceptance of responsibility, significant history of service to his community, excellent character, and the nature of circumstances of this offense. Specifically, we request that the Court sentence Mr. Benson to a term of probation, with the conditions

---

[1] Mr. Benson agrees with probation's determination that he has a total offense level of 11 and a criminal history category of I.

that he maintain employment, pay in restitution the tax amount owed, perform community service, and participate in any Bar procedures relating to the suspension or loss of his license. We submit that such a sentence is sufficient and not greater than necessary to effectuate the goals of sentencing and to avoid unwarranted sentencing disparities.

## INTRODUCTION

Kassius Benson understands the serious mistakes he made when he failed to satisfy his legal and social obligations to pay over quarterly employment and business taxes to the federal government on behalf of his employees and himself. The fact that Mr. Benson did not conceal his tax obligations is evidence of his intent to pay over amounts that were due and owing. But he kept letting time pass, as he addressed the day-to-day of his client's cases and his employees' salaries, and he got further behind on addressing the debt. Mr. Benson is an excellent lawyer, as many of the letters of support submitted to this Court attest. He lacked skills as a small business owner. For his repeated failures to satisfy his obligation to pay over his taxes, Mr. Benson has displayed remorse, accepted responsibility, and assumed the brand of a convicted criminal. The consequences are severe and include the forfeiture of his lifetime dream job as the chief public defender in his adopted hometown, shame and embarrassment for him and his family, and, inevitably, a lengthy suspension or complete loss of his hard-won privilege to practice law.

Mr. Benson is man of principle, who holds to the values taught him by his Air Force NCO father: A man doesn't make excuses. You take responsibility for your own actions. Mr. Benson did so, accepting a plea where his advisory guidelines are a range of 8-14 months and the government will likely ask for jail time.

But in this case, probation is a guidelines-compliant sentence. The probation department observes that an incarceration sentence "may be excessive," PSR at 18, ¶ 81, and concludes that "[r]egardless of the punishment imposed, it does not appear likely that Mr. Benson will reoffend." *See id.* Any amount of jail time is excessive and greater than necessary to effectuate the goals of sentencing and would yield an unwarranted sentencing disparity to the results of prior § 7202 cases in this district.

Mr. Benson worked extremely hard to earn the reputation and trust in the legal community that led him to be named the Chief Public Defender in Hennepin County. He has severely damaged that reputation and squandered that trust through the mistakes that bring him before this Court, and it will be a long road to redemption. He will never be a chief public defender again. He will never walk the hallways of his daughter's schools or attend alumni events of the public defender offices where he worked without sidewise glances and quiet whispers. His punishment will continue after he satisfies whatever sentence this Court imposes, and he will be deterred from future tax avoidance and delay by his very public prosecution that has gained extensive media attention and fall from grace. Those events will also encourage other lawyers to pay as much attention to their financial obligations to the government as to their case needs and court calendars. Jail time for him will not deter others any more than the shame of conviction and probation. Probation will serve the § 3553 purposes of punishment, protect the community, and is sufficient but not greater than necessary given the history of Mr. Benson and his case.

**FACTUAL BACKGROUND**

**A. Mr. Benson's personal history and characteristics and the nature and circumstances of the offense counsel in favor of a probationary sentence.**

Kassius Benson is 53 years old and lives in Plymouth, Minnesota. He has been married twice. He and his first wife Lynne were married for twenty years. They have two adult children, who they deeply love and jointly support. One daughter works in the criminal legal system for the courts. The other, born with a severe disability, lives with Lynne, who reports that Mr. Benson is "a constant in her life…. They speak on the phone daily." Mr. Benson and Lynne remain close. After they divorced, Mr. Benson met and married his second wife, Alyssa. They too are close. Mr. Benson has a second set of daughters with Alyssa. These girls are in grade school. He is a doting father and spends time together with them often. As their mom reports, "They look forward to that time with their father. The girls also speak to him or facetime him every evening to talk about their day and say goodnight." While being candid with his oldest adult daughter Nicole about his faults here, Mr. Benson has tried to shield all four daughters from this matter. His failures are not their responsibility; his failures are his own, not their, burden to bear. Lynne and Alyssa support this protection of the girls.[2]

---

[2] Letters from Lynn and Alyssa are attached collectively as **Exhibit 2**. A letter from Mr. Benson's current partner Nicole, who has children of her own, speaks to her observations of Mr. Benson with his two youngest daughters and is attached as **Exhibit 3**.





Mr. Benson's parents expected excellence from their children. They were to succeed academically, professionally, and morally. His parents knew that they lived in a world especially challenging to Black Americans. These challenges were something to overcome, not about which to complain. Mr. Benson internalized early-on that the

opportunities and talents that he had were best used to uplift other Black Americans and persons less graced than he and his siblings. As a teenager before high school, he resolved to become a trial lawyer. Each of his parents' four children is a success. While Mr. Benson's father passed away relatively young, his mother resides in a local retirement home, where he frequently visits her.[3]



Mr. Benson was the valedictorian of his high school and earned a full four-year academic scholarship to university. He is a superb athlete, but that has never been how he defined himself or how any who knew him defined him. He is first and foremost an intellectual and an activist. Mr. Benson's political awareness as a Black man elevated when he was in college. He concluded that his career path would be one of service to those fellow citizens who can sometimes be ignored or discarded.

For law school, Mr. Benson attended the University of Minnesota on scholarship. Again, he overachieved. To the question: What to do with his life? The answer, to him, was obvious: Become a public defender. Stand next to those individuals who needed a fighter with them against the threat of their loss of liberty.[4] Mr. Benson excelled again.

---

[3] Letters from his siblings Karl and Karla are collectively attached as **Exhibit 4**.
[4] The letter of his law school classmates and long-time friends Toddrick Barnette and Eric Hawkins are collectively attached as **Exhibit 5**.

He was promoted to Senior Law Clerk. After law school, Mr. Benson took a job as a staff attorney with the Hennepin County Public Defender's Office.

Mr. Benson learned of an opportunity to apply to the Public Defender Service in the District of Columbia (PDS). The U.S. Department of Justice has called PDS "the model public defender." Mr. Benson moved far away from home to develop his career at a place where he knew that he would get intensive training to be a public defender, committing his career to defending economically disadvantaged persons. The office instills the core mission of relentless client-centered representation of their clients. PDS' Director Jo-Ann Wallace hired Mr. Benson to begin in the fall of 1997. Mr. Benson found life-long friends with his PDS classmates, who know his character and admire and support him.[5]



Mr. Benson was an excellent lawyer at PDS and worked extremely hard to represent his clients. His advocacy and integrity earned not only the gratitude of his clients but the respect of prosecutors and judges in the Superior Court of the District of Columbia. Mr. Benson could have had a long and distinguished career in Washington, D.C.; but he and

---

[5] Letters from Mr. Benson's PDS colleagues, Ms. Wallace, Sarah Gannett, Professor Kristin Henning, Kelli Neptune, and Professor David Singleton, are attached collectively as **Exhibit 6**. Undersigned *pro hac vice* counsel are PDS classmates of Mr. Benson.

Lynne had a child, found the cost-of-living in DC crushing, and decided to move back home to Minneapolis. Mr. Benson returned to the Hennepin County Public Defender and worked there full-time from 2000 to 2002. When their second daughter was born, their financial needs for medical and daycare skyrocketed. Mr. Benson entered private practice as a solo practitioner at Kassius Benson Law, PA (KBL), while remaining part-time with the public defender for about five years.

In Hennepin County, Mr. Benson continued on the path he started at PDS. He was a trial lawyer who took on the toughest cases and advocated for his clients despite daunting odds and significant challenges. Mr. Benson envisioned the opportunity to expand KBL's reach and serve even more clients, while training younger lawyers and growing the criminal defense bar. He took on junior lawyers, to work as second-chair on the murder cases and other serious cases that he did all across Minnesota.[6]

Mr. Benson paid his associates a salary and saw KBL as a training ground for young, client-centered criminal defense lawyers. He took on employees so that he and they could help more people. Mr. Benson hoped that the junior lawyers could also bring in enough business to cover their own salaries. It did not work out that way.

Mr. Benson's business model was not one built for success. Many small firm criminal defense lawyers make money through volume: turning over as many cases as possible, prioritizing pleas and resolutions versus difficult, lengthy, and expensive trials. Mr. Benson prioritized advocacy: he tried cases where that was the right path for the client and added junior lawyers to cases that he was already doing at a state court-appointed

---

[6] The letter of one such employee, Kaarin Nelson Schaffer is attached as **Exhibit 7**. The letter of Rhia Spears, another young lawyer mentored at KBL, is also attached as part of **Exhibit 7**.

discount rate to better serve the client and to help the public defender offices. Mr. Benson was not earning fees for the work of the junior lawyers, and those lawyers, as it transpired, did not bring in business. Over time, KBL became a place where Mr. Benson was the only one bringing in business, but where the payroll was growing. Mr. Benson paid less attention to how much a client could pay versus the degree of the client's needs. If a colleague sought his help in trying a case in the northern part of the state, Mr. Benson readily agreed to assist. Money was inferior to helping poor and lower-middle-class clients to the very best of his ability.[7]

Meanwhile, Mr. Benson made another mistake: he failed to hire or contract with an office manager, business manager, timekeeper, or accountant. Using low-cost software, he tried to do all that himself. Slowly, but surely, Mr. Benson fell behind, and then kept falling further behind, in KBL's (and thus his, because he was the named, managing attorney) tax obligations.

The years of his tax failures are worth noting. They started in 2013, when his marriage with Lynne ended. After the divorce, he and Alyssa married – it was a second marriage for each of them. Their first daughter was born right away, and a second soon followed. Mr. Benson and Alysa's daughters are the joys of their lives; however, no different than so many other couples, the kids were not enough to sustain a rash marriage.

Mr. Benson was laser-focused on his clients, and throughout the turmoil in his personal life, his commitment to his clients and their defense never wavered. It is possible that even today, Mr. Benson does not fully appreciate how his relentless commitment to his case work negatively affected and contributed to the end of his marriages. He does,

---

[7] The letter of his former client Chris Schumacher is attached as **Exhibit 8**.

however, fully appreciate how his singlemindedness in his legal representation undermined his legal and moral obligation to fulfill timely KBL's federal tax business obligations. He ignored those to his own detriment. He is here today, and accountable.

It is worth noting that Mr. Benson's private practice did not generate great income. For example, in 2020, KBL's last year before he began his term as the Public Defender in January 2021, Mr. Benson's adjusted gross income was $84,247. While earlier years were somewhat more successful, the firm never thrived financially. Mr. Benson rents his home, previously leased a vehicle, now owns a used truck, and does not take lavish vacations. This is not a case about excessive personal compensation, extravagant spending, or concealed wealth. With the benefit of hindsight, Mr. Benson should have recognized the firm's struggles, let the associates go, and returned to a solo practitioner model without employees. While he fell further and further behind in his tax obligations, at no point did he create false books or records to conceal those obligations or pay employees off-book to avoid his liabilities.

While in his private practice, Mr. Benson continued to give back to the community of public defenders who give of themselves to their clients. In 2004, he was one of the lawyers who inaugurated the Minnesota Public Defender Trial School, which assists in training new lawyers and providing mentorship. He served on the faculty every year until last summer when these allegations were reported in the media; he stepped away so as to avoid taking away from the program itself.[8] Mr. Benson also served as

---

[8] Letters from other founders and leaders of the Trial School and fellow Hennepin County public defenders are attached collectively as **Exhibit 9**: David Knutson, Chela Guzman-Wiegert, Gregory J. Egan, IV, Emmett Donnelly, Gretchen Hoffman, Gregory Isaacman, Atif Ahmed Khan, Kristine Kolar, Daniel K. Lew, Madsen Marcellus, and Andre Morant.

founding faculty of the progenitor of Gideon's Promise, the nationally renowned public defender training program started by MacArthur Genius Grant Awardee Jon Rapping.[9]

Mr. Benson served the Board of PICA/Head Start in Minneapolis and on the local branch of the National Alliance on Mental Illness (NAMI). Always seeking to decarcerate, he served as the first Board President of the Minnesota Freedom Fund, which helped support bail of indigent persons. His contributions to Minnesota public defenders earned him the Ira Mickenberg Award for Outstanding Contribution to Minnesota Public Defense in 2018.[10]

On January 1, 2021, Mr. Benson reached the pinnacle of his professional achievement: He assumed the role as Chief Public Defender of the Hennepin County Public Defender's Office. George Floyd had been killed the previous year; the state and our country seemed to finally be ready for a racial reckoning. At the same time, the country was in the midst of a global pandemic. The office was in desperate need of leadership, which Mr. Benson provided. The Court can read Mr. Benson's perspectives on his opportunities and obligations as Chief Public Defender at Perspectives on 2020 From Hennepin County Chief Public Defender Kassius O. Benson (mnbar.org).[11]

---

[9] A letter from Professor Rapping is attached as **Exhibit 10**.
[10] A letter from Mr. Mickenberg is attached as **Exhibit 11**.
[11] A copy is also attached as **Exhibit 12**.



Public defenders in the office at the time he was hired, those he hired, and those who remain all speak about the positive leadership model that Mr. Benson provided.[12] He personified and established a program for which so many lawyers – of color and not – longed.

Mr. Benson's failure in meeting his tax obligations came out publicly in 2022. His legal problems threatened to distract from the important work of the public defender office. Mr. Benson's boss, Bill Ward, the head of the state public defender system, supported Mr. Benson.[13] Mr. Benson heeded his father's words: take responsibility for your own actions and don't let your mess dirty up another. Mr. Benson proactively resigned – in a feeling of disgrace, even if his colleagues and lawyers saw that he remained more than his flaws.

---

[12] Letters from two of his hires, Claire Nicole Glenn and Sarah Anne Koziol, are attached collectively as **Exhibit 13**. Letters in **Exhibit 9** also address Mr. Benson's dedicated and inspirational leadership.

[13] Mr. Ward's letter is attached as **Exhibit 14**.

For his criminal tax offenses, in addition to this sentencing, Mr. Benson will also face legal disciplinary action, including the potential revocation of his law license. The Minnesota Supreme Court "has traditionally viewed failure to file tax returns as warranting stringent lawyer discipline." *In re Johnson*, 414 N.W.2d 199, 201 (Minn. 1987). This § 7202 conviction will not inevitably result in the loss of his license; he will likely seek to present to the Minnesota authorities substantial mitigating reasons to try to prevent that ultimate professional disability. Nonetheless, "the presumptive discipline for a felony conviction is disbarment," *In re Andrade*, 736 N.W.2d 603, 605 (Minn. 2007), and there is no doubt that, even if disbarment is avoided, a very lengthy suspension appears inevitable. *See, e.g.*, 414 N.W.2d at 202 ("Failure to timely file and pay his individual income taxes, combined with his failure to timely file returns or timely pay employee withholding taxes [with prior discipline] merits indefinite suspension from the practice of law with no right to apply for reinstatement prior to the expiration of 18 months. Additionally, Mr. Benson's professional discipline liability is not limited to what the Minnesota state licensure regulation (and D.C. Bar) decide. This Court can impose its own professional discipline, disbarring Mr. Benson from practice in federal court. *See, e.g.*, U.S. Dist. Minn., LR 86.3(b).

**B. Kassius Benson feels and displays full remorse and shame for his unlawful failure to pay over federal taxes.**

The record is replete with Mr. Benson's acceptance of responsibility, remorse, and shame for his actions. The Court can view that in the letters from his family and friends, who report how Mr. Benson has talked about and responded to his criminal offense and the consequences that he has wrought upon himself. The Court can also see it in Mr. Benson's detailed letter to probation and in his personal, contrite letter to the Court itself.

*See e.g.*, PSR at 4-6, ¶ 15 ("As a business owner, I had an undisputed duty to collect the amounts due to the IRS, file the appropriate quarterly returns, and pay over the amount of the taxes to the IRS. The bottom line is that I had a duty and responsibility to perform these actions and pay over the taxes. I did not do it…. I brought these consequences on myself. They are an unsurprising by-product of my own inactions and actions. At the end of the day, I understand that consequences that I have suffered are due to no one's fault but my own."); Mr. Benson's Letter to the Court, attached as **Exhibit 1** ("As the business owner, I had the sole responsibility to properly handle the tax matters and chose not to do so. I will make amends. My remorse and apologies extend not only to the Internal Revenue Service and the federal government but also to my former employees, friends, family, colleagues, my profession, and the Court. I cannot fully describe the remorse I feel in letting down all the people that looked up to and believed in me.").

## THE STATUTORY PENALTIES

Mr. Benson will be convicted as to one count of failing to account for and pay over employment taxes pursuant to 26 U.S.C. § 7202. The offense does not have any mandatory prison time, mandatory supervised release, or mandatory fine; it is probation eligible. Given Mr. Benson's financial situation, the Court should follow the recommendation of the probation department and decline to impose a fine. The conviction requires a $100 special assessment, and the Court should impose the agreed restitution in the amount of $213,591.53. And the Court should impose probation.

## THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The relevant guidelines are not in dispute. Mr. Benson's base offense level is 16. There are no enhancements. The offense level is reduced by 3 to account for Mr.

14

Benson's acceptance of responsibility for an interim offense level of 13. Mr. Benson meets the criteria of Guideline § 4C1.1(a), which reduces his total offense level to 11.

Mr. Benson has no prior convictions. He is in criminal history category 1. He has zero criminal history points. With a Total Offense Level of 11 at Category 1, Mr. Benson's incarceration guidelines are 8-14 months. Because the applicable guideline range is in Zone B, a probation sentence is guidelines-compliant. More than that, recent and current guidance points toward a non-incarceration sentence as generally appropriate. No reason exists in this case to vary from that general norm. Probation is appropriate. A jail sentence is excessive, serves no valid purpose, and is greater than necessary.

## I.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

### A. Kassius Benson's life has been one of service and honoring and following the law.

This Court has the benefit of a detailed presentence investigation report, as well as more than two dozen letters. Counsel will not repeat here the information that the Court has in other forms. In short, Mr. Benson's entire life has been about selflessly giving to others – especially his clients and low-income persons facing the stress of criminal charges, his junior colleagues, and his four children.

### B. The need for the sentence to reflect the seriousness of the offense and promote respect for the law

A sentence of probation – within the Guidelines, supported by Probation, and consistent with other sentences in cases with more aggravation and less mitigation than here – will reflect the seriousness of the offense and promote respect for the law.

### C. The need for the sentence to afford adequate deterrence

A sentence of probation will afford both adequate specific and general deterrence. As for specific deterrence, Mr. Benson will never make these mistakes again. No one could credibly claim that Mr. Benson will ever avoid his tax obligations given his experiences here and his lifetime of lawful behavior. A carceral sentence provides no additional benefit in that regard. As for general deterrence, others will see that Mr. Benson was prosecuted and convicted, gave up his leadership position as the Public Defender, is facing the presumption of suspension and disbarment from the practice of law, and is required to pay restitution, remain under supervision and perform significant community service. Other business owners will know from the bitter lesson that he has learned that they need to avoid situations in which he placed himself and to remove themselves earlier than he did. *See, e.g.*, Zvi D. Baggay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 CARDOZO J. CONFLICT RESOLUTION 421, 447-48, 448-49 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity"; "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

### D. The sentencing guidelines

After *United States v. Booker*, 543 U.S. 220 (2005), sentencing is no longer a mathematical exercise. The guidelines range is advisory and courts must consider the recommended range as one of seven statutory sentencing factors enumerated in 18 U.S.C. § 3553(a). In determining a sentence, courts must impose the least amount of imprisonment necessary to accomplish the § 3553(a) purposes. "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."

16

*Nelson v. United States*, 555 U.S. 350, 352 (2009). The district court shall impose a sentence *sufficient, but not greater than necessary*, to comply with the intent of § 3553(a). "[T]he punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 477 (2011). *See Gall v. United States*, 552 U.S. 38, 52 (2007) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue" (quotation omitted)).

### E. The need for the sentence to avoid unwarranted sentencing disparities

Section 3553(a)(6) directs the court "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A probationary sentence is consistent with other sentences in cases in this district for violations of § 7202. Our review of this district's § 7202 cases yields a number of conclusions: Mr. Benson's *guidelines are lower than every single other case*, and thus, there is no case that is comparable to his because all others presented a situation more aggravated. And yet, in **ten** § 7202 cases, a judge of this Court varied downward and imposed a sentence of probation instead of imposing a carcerative sentence. *See United States v. Junes*, 21-cr-181-SRN (Mar. 23, 2022) (with loss amount of $408,193 and advisory guidelines of 18-24 months, imposing sentence of three years of probation); *United States v. Paskewich*, 19-cr-2-SRN (Sept. 17, 2019) (with loss amount of $1,132,105 and advisory guidelines of 30-37 months), imposing sentence of three years of probation); *United States v. Hedin*, 19-cr-252 (Feb. 20, 2020) (with loss amount of $158,958 and advisory guidelines of 12-18 months, imposing sentence of three years of

probation); *United States v. Okeson*, 15-cr-74-DWF (Nov. 25, 2015) (with loss amount of $89,460 and advisory guidelines of 10-16 months, imposing sentence of three years of probation); *United States v. Uden*, 14-cr-325-JNE (Jan. 8, 2016) (with loss amount between $200-300,000.00 and advisory guidelines of 18-24 months, imposing sentence of three years of probation); *United States v. Voss*, 14-cr-103-RHK (Sept. 25, 2014) (with loss amount of $159,857 and restitution amount of $244,922 and advisory guidelines of 12-18 months, imposing sentence of three years of probation); *United States v. Nguyen*, 11-cr-237-DSD (Mar. 11, 2013) (with loss amount of $288,387 and advisory guidelines of 18-24 months, imposing sentence of five years of probation); *United States v. Clough*, 12-cr-109-RHK (Sept. 10, 2012) (with loss amount of $944,134 and advisory guidelines of 24-30 months, imposing sentence of three years of probation); *United States v. Kopel*, 10-cr-29-MJD (Jan. 27, 2011) (with loss amount of $627,427 and advisory guidelines of 25-30 months, imposing sentence of three years of probation, with six months in a residential re-entry center and six months on home detention); *United States v. Schwarz*, 07-cr-308-JRT (Apr. 29, 2008) (with loss amount of "almost $200,000" and advisory guidelines of 12-18 months, plus existence of false statements by defendant, imposing sentence of five years of probation).

Of the representative § 7202 cases in the district, many of them had loss amounts far exceeding the figure here – with three cases presenting loss amounts close to or over a million dollars. The *Voss* case has perhaps the most similar underlying facts. Mr. Voss was a well-known Minneapolis criminal defense attorney, whose street-crime practice reportedly included high-profile trial cases and some pro bono cases. Over a period of three and a half years, he failed to pay over federal taxes withheld from the salaries of his

18

law firm, including his own salary. For this violation, as well as other professional violations that related to his client representation, Mr. Voss was disbarred prior to his sentencing hearing, subject to a request for re-admission. Notwithstanding the loss amount known to the parties prior to his sentencing hearing, his restitution amount substantially increased the amount due to the government to almost $245,000. He received a downward variant sentence of three years of probation, with no requirement of home detention. Here, because of Mr. Benson's lower guidelines, the Court need not vary downward in order to impose a consistent and appropriate sentence, even though the parallels are clear. Mr. Voss and Mr. Benson were both attorneys. Each ran a small business. Each failed at the running of that business as it expanded beyond their managerial and administrative capacity. Mr. Benson's tax failures were those of the owner of a small business, and Mr. Benson similarly should receive a sentence of probation without home confinement and with conditions as set forth below that permit him to work to pay the monetary debt he owes the government.

## CONCLUSION

For the reasons above, we request that the Court impose a sentence of probation with conditions of employment, restitution in the amount of $213,591.81, responsive participation in any Bar investigation and determination into the status of his law license, and completion of community service hours. Counsel reserves the right to respond to the government's sentencing memorandum and to make additional requests at the time of the sentencing hearing.

Dated: March 13, 2024                    Respectfully submitted,

By:        /s/ Edward J. Ungvarsky
           Edward J. Ungvarsky
           D.C. Bar # 459034
           *Adm. Pro Hac Vice* to U.S. District Court for MN
           UNGVARSKY LAW, PLLC
           421 King Street, Suite 505
           Alexandria, VA 22314
           Telephone: (571) 207-9710
           Mobile: (202) 409-2084
           Email address: ed@unvarskylaw.com

By:        /s/ Andrew T. Wise
           Andrew T. Wise
           D.C. Bar # 456865
           *Adm. Pro Hac Vice* to U.S. District Court for MN
           MILLER & CHEVALIER CHTD
           900 16th St. NW
           Washington, D.C. 20006
           Telephone: (202) 626-5818
           Mobile: (202) 744-4943
           Email address: awise@milchev.com

By:        /s/ Daniel S. Adkins
           Daniel S. Adkins, Esquire
           Attorney License No. 266085
           North Star Law Group
           413 N Wacouta Street, Suite 500
           Saint Paul, MN 55101
           Telephone: 651-330-9678
           Email: dan@northstarcriminaldefense.com

## CERTIFICATE OF SERVICE

   I hereby certify that on the 13th day of March, 2024, I electronically filed a true copy of the foregoing memorandum with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.

                         /s/
                Edward J. Ungvarsky, Esquire

20